IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRIOT CONTRACT SERVICES,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant.<br>_____/ | No. C 04-5428 MJJ<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |

## INTRODUCTION

Before the Court is Plaintiff Patriot Contract Services' ("Plaintiff") motion for preliminary injunction in this maritime disappointed bidder case. Intervenors Sailors' Union of the Pacific ("SUP"), International Organization of Masters, Mates & Pilots ("MMP"), and Pacific Coast Marine Fireman, Oilers, Watertenders and Wipers ("MFOW") support Plaintiff's motion.[1] Defendant United States and Intervenor-Defendant American Overseas Marine Corporation ("AMSEA") oppose the motion. For the following reasons, the Court **DENIES** Plaintiff's motion.

## FACTUAL BACKGROUND

For four years running, Plaintiff Patriot Contract Services ("Plaintiff or "Patriot") operated

---

[1] The Court granted the unions' motions to intervene on April 25, 2005. At oral argument on the instant preliminary injunction motion, the Government alerted the Court to a statute, 28 U.S.C. § 1292(d), which requires a 60-day stay on all proceedings following a district court's ruling on a motion to transfer to the U.S. Court of Federal Claims. On April 13, 2005, the Court denied the Government's motion to transfer. Thus, the Government contends that the 60-day stay in effect bars the unions from intervening. The Court disagrees. The unions expressly sought to intervene for the limited purpose of being heard on Plaintiff's motion for preliminary injunction. The granting of preliminary or injunctive relief is expressly excepted from the stay rule announced in § 1292(d). Accordingly, the Court finds that the unions' limited intervention on that issue is similarly excepted from the 60-day stay.

and maintained eleven Large Medium Speed Roll-On/Roll-Off ("LMSR") ships for the United States Navy Military Sealift Command ("MSC"). LMSR vessels are a key component of the surge sealift capacity of the United States armed forces. The operator of the LMSR ships must maintain the vessels and be prepared to mobilize a full crew to deploy in support of military missions throughout the world on short notice.

To maintain and operate the LMSRs, Plaintiff employs approximately 300 unlicensed deck personnel who are SUP members, approximately 100 unlicensed deck personnel who are MMP members, and 100 unlicensed engine department crew who are MFOW members. Plaintiff has collective bargaining agreements ("CBAs") with all three unions.

On December 11, 2003, MSC issued Request for Proposals Number N00033-04-R-5300 (the "Solicitation"), soliciting bids for the worldwide operation and maintenance of its eleven LMSR ships.[2] According to the Solicitation, the ship operation contract would be awarded to the offeror whose proposal "represents the best overall value to the Government, given the outcome of the Government's evaluation of each offeror's technical proposal, past performance and price." (Declaration of Bryant E. Gardner ("Gardner Decl."), Ex. H, Tab 3, § —1 at 134.)[3] The Solicitation expressly noted that the technical evaluation factors would be more important than past performance and that the technical factors and past performance, taken together, would be more important than price. (*Id*. at 135.) The importance of price, however, would increase as the differences in evaluated technical quality and in past performance among the offerors decreased, such that price could "become the determinative factor for making [the] award." (*Id*. at 138.) The five identified technical evaluation factors, in order of importance, were Technical Experience & Capability, Management of Purchasing Systems and Reimbursables, Management Organization (including Organizational Structure and the identification of Key Personnel), Management Systems, and Participation of Small Business, HUBZone Small Businesses, Small Disadvantaged Business, Women-Owned Business Concerns. As part of the first factor, MSC would consider the bidder's

---

[2] Two of the eleven LMSRs are not relevant here as they were set aside for small business participation. At issue here is the operation and maintenance of only nine LMSRs.

[3] Exhibit H to the Bryant Declaration consists of the Solicitation, AMSEA's response to the Solicitation, and Plaintiff Patriot's response to the Solicitation. These documents were filed under seal.

2

experience and demonstrated ability to maintain and operate "ships of similar type and/or size" to the LMSRs. (*Id*. at 136.) With respect to Key Personnel, the Solicitation required offerors to "submit up-to-date resumes of all identified key personnel to be employed in accomplishing the stated requirements" and letters of commitment from each identified worker, "stating his/her intention on the resultant contract." (*Id*. at § L-19, ch. 3 at 128–29.) The offerors' Past Performance rating would be based, in large part, upon feedback from customers on relevant present and past contracts. (*Id*. at 133.)

Plaintiff Patriot and Intervenor AMSEA were two of five entities that submitted bids in response to the Solicitation. According to Patriot, Patriot had vast experience operating the very LMSR vessels at issue whereas AMSEA had only negligible experience with LMSRs of any type and very limited experience with twin screw diesel powered ships, which the LMSR vessels at issue are. Additionally, according to Plaintiff, Patriot was the only operator of all but one of the Government's BOB HOPE class vessels, which comprise seven of the vessels at issue here,[4] and AMSEA lacked any experience operating BOB HOPE class vessels. According to Plaintiff Patriot, there is no dispute that MSC's evaluation team recognized that Patriot provided the best technical and management solution for the Government. However, Patriot and AMSEA were assigned nearly identical technical scores.[5] With respect to price, AMSEA's bid was $6.5 million (or about 5.4%) lower in price than Patriot's.

On August 31, 2004, the Government awarded the ship operation contract (the "Contract") for the operation and maintenance of the nine LMSR vessels to AMSEA.[6] The MSC's Source

---

[4] The other two vessels at issue are part of the SHUGHART class of LMSR ships.

[5] Both bidders were rated "Exceptional" in the most important subcategory of Technical Experience & Capability, in the second most important subcategory of Management of Purchasing Systems and Reimbursables, and for Property Control (one of two factors in the fourth-ranked Management Systems subcategory). Both bidders were rated "Very Good" for Organizational Structure (one of two factors in the third-ranked Management Organization subcategory) and for the least significant (for evaluation purposes) Participation of Small Business, HUBZone Small Businesses, Small Disadvantaged Business, Women-Owned Business Concerns subcategory.
Patriot was rated "Exceptional" on its Key Personnel (one of two factors in the Management Organization subcategory) and for Quality (the other Management Systems factor) while AMSEA was only rated "Very Good" in those categories.

[6] SUP, MMP, and MFOW do not have CBAs with AMSEA.

3

Selection Authority ("SSA"), which evaluated the bid proposals, prepared a Decision Memorandum explaining its rationale for choosing AMSEA. According to the SSA, AMSEA's "Exceptional" technical rating was based on its demonstrated extensive experience and capability in the maintenance and operation of ships of a similar size and type to the LMSRs because it had operated Fast Sealift Ships ("FSS"), which are of similar size and type, and Maritime Prepositioning Ships ("MPS") and Ready Reserve Force ("RRF") ships, which are of similar type to the LMSR vessels. The SSA explained that while AMSEA and Patriot were determined to be technically equivalent and their past performance ratings the same, AMSEA's proposed price was lower than Patriot's such that AMSEA's proposal was the best overall value to the Government. (Declaration of John Henry ("Henry Decl."), Ex. A at 13.)

After the Contract was awarded to AMSEA, AMSEA began advertising for port engineers because post-award several of the six port engineers identified in the bid proposal declined to work on the LMSR Contract.

Patriot timely filed a bid protest with the United States Government Accountability Office ("GAO"). Pursuant to the Competition in Contracting Act, MSC stayed performance of the Contract pending the adjudication of the GAO protest. 31 U.S.C. § 3553(c)-(d). This meant that during that time, Patriot continued to maintain and operate the LMSR vessels at issue. Before the GAO issued its final decision, Patriot withdrew its protest and filed the instant lawsuit for declaratory relief.[7] When MSC then decided, in accordance with the Contract, to effect the transition of the operation and maintenance of the LMSR vessels from Patriot to AMSEA, Plaintiff filed the instant motion for preliminary injunction. Plaintiff seeks to enjoin Defendant from transitioning the operation of the LMSRs from Patriot to AMSEA pursuant to the Contract, which, Plaintiff claims, was awarded unlawfully under federal procurement law. At the hearing on this motion, the Court was informed

---

[7] At Intervenor-Defendant AMSEA's request, in a March 15, 2005 Order, the Court requested that the GAO provide an advisory opinion to the Court by April 15, 2005. On March 22, 2005, Dan Gordon of the GAO contacted the Court and admitted that the GAO would be hard-pressed to meet that deadline. The Court then issued an Order respectfully requesting that the GAO provide its advisory opinion before the hearing on the instant motion, if at all possible, but declaring that the hearing would proceed in any event. The Court received the GAO's advisory opinion on May 10, 2005. In that opinion, the GAO advised that in light of new evidence that AMSEA engaged in fraudulent misrepresentation with regard to the key personnel identified in its bid proposal, it would sustain the bid protest and require the Government to begin the procurement process anew.

4

that the transition of three of the vessels is complete. The transition process was initiated on April 25, 2005 as to three others, and is scheduled to be complete on May 6, 2005. With respect to the three remaining ships, transition has not yet begun but is scheduled to be complete by June 30, 2005.

## LEGAL STANDARD

The basic function of a preliminary injunction is to preserve the status quo pending a determination of the outcome on the merits. *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988). The status quo means the last uncontested status which preceded the pending controversy. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). Courts apply one of two standards to determine whether a preliminary injunction should issue. To meet the "traditional" test, the movant must establish: (1) a strong likelihood of success on the merits; (2) the possibility that the movant will suffer irreparable harm if the injunction does not issue; (3) that the balance of hardships favors its case; and (3) that the public interest favors granting the injunction. *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir. 1983). To prevail under the "alternate" test, the movant must demonstrate either a combination of probable success on the merits and the possibility of irreparable injury, or that serious questions are raised and that the balance of hardships tips sharply in its favor. *Id.*; *see also Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir. 1990). The formulations under the "alternate" test represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *Diamontiney*, 918 F.2d at 795. Under either formulation, at an "irreducible minimum," the moving party must show a fair chance of success on the merits. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994).

Injunctive relief will not be granted "unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993). In reviewing motions for mandatory relief, "courts should be extremely cautious about issuing a preliminary injunction." *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984). Additionally, "any injunction regarding government functions is generally permitted only in 'extraordinary circumstances.'" *Rizzo v. Goode*, 423 U.S. 362, 379 (1976).

## ANALYSIS

1   Plaintiff Patriot contends that the bid solicitation process employed here and the
2  Government's ultimate decision to award the Contract to AMSEA violated federal law governing
3  military agencies' procurement of supplies and services. Plaintiff accordingly seeks a preliminary
4  injunction to prevent Defendant from transitioning the operation and maintenance of the LMSRs to
5  AMSEA pending the outcome of this lawsuit.

**I.     Standard of Review**

A significant threshold matter, here, is the appropriate standard of review that the Court should employ in reviewing the agency's evaluation process and ultimate decision to award the LMSR Contract to AMSEA. Defendant and Intervenor-Defendant AMSEA contend that the appropriate standard of review in this case is that provided by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, *et seq*. Plaintiff, however, claims that because this suit is brought under the Suits in Admiralty Act ("SIAA"), 46 U.S.C. § 741, *et seq.*, the APA does not apply. The Court agrees with the Government.

**A.     The APA Standard of Review Applies Here.**

Bid protests, even those brought in federal district courts rather than in the U.S. Court of Federal Claims pursuant to the Tucker Act, are generally governed by the APA standard of review. *See, e.g., Latecoere Int'l, Inc. v. U.S. Dept of the Navy*, 19 F.3d 1342 (11th Cir. 1994); *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir. 1978); *Continental Heller Corp. v. Secretary of Navy*, 1998 U.S. Dist. LEXIS 16326 (N.D. Cal. June 8, 1998); *DTH Management Group v. Kelso*, 844 F. Supp. 251 (E.D. N.C. 1993). The deferent APA standard of review has also been adopted by courts in admiralty cases to review non-adjudicatory agency activities. *See United Sates v. Hyundai Merchant Marine, Ltd.*, 172 F.3d 1187, 1191 (9th Cir. 1999).

Plaintiff contends that because it does not allege APA violations,[8] and because the Court has SIAA jurisdiction (and not Tucker Act jurisdiction, which confers jurisdiction over non-maritime bid protests with the U.S. Court of Federal Claims and requires APA's standard of review), the APA

---

[8] Plaintiff's original complaint employed the caption, "Administrative Procedure Act Case," and described in detail, in the Summary of the Action section, the APA standard of review in cases appealing a government agency's award of a contract. In its subsequent amended complaints, including the operative Second Amended Complaint, all explicit references to the APA have been removed.

6

does not apply. Admiralty lawsuits against the Government brought pursuant to the SIAA "shall proceed and shall be heard and determined according to the principles of law and to the rules of practice obtaining in like cases between private parties." 46 U.S.C. Appx. § 743. Plaintiff contends that this means that the MSC's decision should be reviewed just as a private entity's contract decision would be and is not entitled to any government agency deference.[9] The Court disagrees.

      Having located no case law that suggests that the SIAA language cited above requires federal courts to review agency contract decisions *without* deference, the Court is guided by the deferent standard of review employed in the non-SIAA bid protests involving government agency decisions noted above,[10] as well as by the longstanding *Chevron* rule. The *Chevron* rule states that "courts should respect an executive-branch agency's reasonable interpretation of statutes and regulations the agency is charged with administering." *Shoals Amer. Industries, Inc. v. United States*, 877 F.2d 883, 888 (11th Cir. 1989) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). This is particularly true in procurement cases as there is a "strong public interest in avoiding disruptions in procurement, and for withholding judicial interjection unless it *clearly* appears that the case calls for an assertion of an overriding public interest." *Id*. (emphasis in original); *see also Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973) ("in cases involving government procurement of contracts, courts have traditionally applied [a] . . . deferential standard of review whereby only agency actions that have no 'reasonable' or 'rational' basis are deemed contrary to law.") Accordingly, the Court finds that a deferent standard of review is appropriate in assessing MSC's solicitation process and award decision. Because the APA standard

---

[9] Plaintiff argues, in the alternative, that if the APA standard of review applies, MSC's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" such that it violated the APA. (Motion at 6 n.4.)

[10] The Government cites the *Puglia Engineering* case – in which a maritime bid protest action was brought against the Government pursuant to the SIAA – to support its contention that the APA standard of review should be employed here. *Puglia Engineering v. U.S. Coast Guard*, 2004 U.S. Dist. LEXIS 24257, *1 (N.D. Cal. Nov. 19, 2004). While the Court agrees that the APA is the appropriate standard of review, the *Puglia* case is not dispositive on that point. In *Puglia*, which this Court recently decided, the Court applied the APA's deference-to-the-agency standard of review in assessing a disappointed bidder's motion to enjoin the Government from commencing repairs on a Coast Guard cutter. However, the parties in that case did not disagree as to the appropriate standard of review. Accordingly, *Puglia Engineering* is not determinative of whether the APA standard applies here or whether the MSC's decision deserves no deference, as Plaintiff urges.

of review is employed in bid protests, the Court will employ that standard here.

### B. The APA Standard of Review

According to the APA, a court may only invalidate agency decisions if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Administrative decisions are entitled to a presumption of validity, and "absent a showing of arbitrary action, [courts] must assume that the agencies have exercised this discretion appropriately." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). This standard of review is highly deferential. "Review under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency." *Western Radio Servs. Co. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996). A court may reverse an agency decision:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*.

In the context of disappointed bidder cases, courts have employed the APA standard of review and have held that the protesting contractor must demonstrate either (1) the procurement official's decision has no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *Kinnett Dairies*, 580 F.2d at 1271. Agencies making contract award decisions "are entitled to exercise discretion upon a broad range of issues confronting them, including 'considerations of price, judgment, skill, ability, capacity, and integrity' in the selection of businesses with whom the government will enter into contracts." *Latecoere*, 19 F.3d at 1356 (citation omitted). "Accordingly, reviewing courts should be concerned with whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id*. Thus, if a reviewing court finds a reasonable basis for the agency's decision, it should "stay its hand" and should not "intervene in the procurement process." *Id*.

### II. Plaintiff's Motion For Preliminary Injunction

Plaintiff Patriot alleges that MSC's evaluation process and ultimate decision to award the Contract to AMSEA over Patriot violated federal procurement law. Plaintiff also alleges that the

8

solicitation process was tainted by AMSEA's fraudulent misrepresentations or, at least, a "bait and switch." In the procurement of goods and services, federal agencies are required to "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation." 10 U.S.C. § 2304(a)(1)(A). "In preparing for the procurement of property or services, the head of an agency shall — (i) specify the agency's needs and solicit bids or proposals in a manner designed to achieve full and open competition for the procurement; . . . and (iii) develop specifications in such manner as is necessary to obtain full and open competition with due regard to the nature of the property or services to be acquired." 10 U.S.C. § 2305(a)(1)(A). The agency shall evaluate the bids submitted "based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1).

Plaintiff seeks to enjoin Defendant from transitioning dominion over the LMSRs from Patriot to AMSEA pending the outcome of a trial on Plaintiff's complaint. Toward that end, Plaintiff contends that it will likely succeed on the merits of its complaint, that it will suffer irreparable injury unless the Court grants injunctive relief, that the balance of hardships tips in its favor, and that the public interest favors enjoining the Government from transitioning operation of the LMSRs to AMSEA. Defendant United States argues that Plaintiff is not likely to prevail on the merits because AMSEA's proposal represented the best overall value for the Government, and that its decision to award AMSEA the Contract was reasonable, expressly allowed by regulations, and warrants deference. Defendant also contends that AMSEA's proposal was not tainted by fraud nor did AMSEA engage in a bait and switch. Defendant additionally argues that the economic harm Plaintiff will suffer does not constitute irreparable harm, and that the balance of hardships and the public interest both weigh in favor of denying the motion, particularly in light of the inevitable operational problems that any delay in the transition will cause, and the substantial costs to AMSEA, the Government, and taxpayers if the Government is enjoined from turning the vessels over to AMSEA.

### A.     Likelihood of Success on the Merits

Plaintiff's claims on the merits reduce to two basic arguments: (1) the Government violated federal procurement law by failing to evaluate AMSEA's and Patriot's bids according to the

9

1  Solicitation's stated selection criteria; and (2) the Contract should be terminated because AMSEA
2  proposed to employ key personnel who were not hired once the Contract was awarded.

### 1. The Government's Evaluation of the Proposals

Plaintiff contends that Defendant evaluated the offerors' technical and management proposals and their past performance in such a way that either ignored or masked Patriot's superior experience and capability with respect to operating and maintaining ships of a similar size and type in a comparable operating environment to that contemplated under the Solicitation.  Plaintiff argues that as the incumbent operator of the LMSRs, its technical expertise was far superior to AMSEA's and that Patriot should have been rated higher than AMSEA on the technical factors (or that AMSEA should have been rated lower than it was).  Plaintiff also contends that the MSC improperly credited AMSEA with prior experience that was not as relevant as Patriot's.  Finally, Patriot argues that the MSC departed from the best value scheme described in the Solicitation by ultimately choosing the lowest-priced bid.  The Court finds, particularly in light of the deference owed Government agencies in making contract award decisions, that Plaintiff has not demonstrated that it is likely to succeed on the merits of its claim that violations of federal procurement law occurred here.

MSC's SSA provided reasonable explanations for AMSEA's ratings.  While Patriot had significant experience operating and administering the very ships at issue here, AMSEA had operated the Government's eight Fast Sealift Ships for four years, including deployment to Iraq, five Ready Reserve Force ("RRF") Roll-On/Roll-Off ships ("RO/ROs"), four Maritime Prepositioning Ships, and the USNS STOCKHAM, all at the same time.  According to the SSA's report, all of these ships are "of the same type as the LMSRs; the eight FSS are of the same size as the LMSRs; they all perform the same type of mission; and the STOCKHAM is a modified LMSR."  (Henry Decl, Ex. A at 3.)  Plaintiff contends that none of these ships were twin-propeller shaft diesel engines like the LMSRs.  While it may be true that AMSEA's technical experience was not as relevant as AMSEA's, the Court notes that the Solicitation expressly stated that the Government was interested in the competitors' experience with ships of similar size and type and did not require that the bidders have experience with the exact vessels at issue to be rated "Exceptional."  As the SSA reasonably

explained, AMSEA earned its overall "Exceptional" rating in many of the technical evaluation factors because "their approach has a high probability of meeting requirements with limited technical risk." (*Id*.) Moreover, the Court is not in a position to substitute its judgment for the Government's in this highly technical decision-making process. Plaintiff has not demonstrated that the Government was unreasonable in rating AMSEA exceptional in this category.

With respect to repair experience, the SSA noted that AMSEA had "performed over 42 drydockings/overhauls on its . . . vessels" and had conducted "within budget" drydockings with a near perfect completion-on-time record. (*Id*. at 6.) The SSA also observed AMSEA's long history of operating and managing ships for the Government, particularly in war efforts, and its demonstrated ability to operate "in remove areas and under severe and dangerous conditions." (*Id*.) Patriot's repair experience may have been more relevant, but that does not make AMSEA's experience less than exceptional nor does it render the agency's rating decision unreasonable.

With respect to the Key Personnel factor, the SSA provided a reasonable explanation for AMSEA's "Very Good" rating. (*Id*. at 6.) Even if Plaintiff is right that its personnel proposal was superior to AMSEA's, it appears that MSC accounted for the differences by giving Patriot a higher rating on that factor. Patriot has not demonstrated that the "Very Good" rating was unreasonable.

With respect to Plaintiff's contention that its expertise and experience was ignored by the MSC in its evaluation, the Court disagrees. Plaintiff was rated "Exceptional" for nearly every sub-factor in the technical category, the most important of the evaluation categories.[11] The evaluation results clearly reflect Patriot's technical expertise here. Plaintiff's contention that the rating system should allow for finer distinctions between offerors is without merit. The MSC is entitled to use an adjectival rating system as "procurement officials have 'broad latitude in determining the particular

---

[11] Plaintiff specifically complains that it was improperly given only a "Very Good" rating in the Organizational Structure sub-factor. (AMSEA was also rated "Very Good" for this sub-factor.) Plaintiff contends that MSC's explanation for the "Very Good" rating, that Patriot had not "cited any examples of the use of innovative or state of the art approaches," was improper since nowhere in the Solicitation is there any indication that evaluation under this sub-factor would turn on innovative or state of the art approaches. Because MSC failed to make its award decision based solely on the factors specified in the Solicitation, Plaintiff argues, the evaluation process was flawed.

While the Solicitation does not expressly say that "innovative" or "state-of-the-art" approaches will be taken into consideration, the Court finds that the Government's explanation for the rating is not so unreasonable to warrant judicial intervention.

11

1  method of proposal evaluation to be utilized.'" *Delta Dental Plan of Cal. v. Perry*, 1996 U.S. Dist.
2  LEXIS 2086, * 44–45 (N.D. Cal. Feb, 20, 1996) (citation omitted).  The agency's judgments about
3  "slight qualitative differences" in proposals are "not subject to rational legal objections unless a
4  clear showing of unreasonableness is made." *Id*. at *51 (citation omitted).   Here, Plaintiff has not
5  demonstrated that the MSC was unreasonable.  The Court finds that the SSA's explanation for
6  assigning AMSEA the highest technical rating is reasonable and should not be disturbed.
7        Plaintiff claims that Defendant improperly conducted its "best value" analysis, effectively
8  converting the procurement into one where price, rather than technical merit, became the decisive
9  evaluation criterion.  The Court disagrees.  The Solicitation expressly states that where the
10 differences among the technical and past performance ratings decrease, price becomes a more
11 important factor, and where all other factors are equal, price "may become the determinative factor
12 for making [the] award."  (Gardner Decl., Ex. H, Tab 3, § —1 at 138.)  Here, Patriot's and
13 AMSEA's respective technical evaluation ratings were essentially the same – "Exceptional."  Their
14 past performance was also rated "Exceptional."  With the most important factors being equal, MSC
15 was entitled, based on the express language of the Solicitation, to choose AMSEA whose bid price
16 was $6.5 million lower than Patriot's.  As discussed above, Plaintiff has not demonstrated that the
17 MSC's evaluation of the technical and past performance factors was improper.  Accordingly,
18 Plaintiff has not demonstrated a likelihood of success on the merits that MSC failed to properly
19 employ the best value evaluation method.
20       The *Latecoere* case, cited by Plaintiff to support its argument that the MSC improperly
21 evaluated the offerors' bids, is inapposite.  19 F.3d 1342.  In that case, the Eleventh Circuit reversed
22 a lower court's grant of summary judgment in the government agency's favor.  The court found that
23 while courts should generally be deferent to a government agency's contract decisions, the
24 Navy's contract award decision in that case was unreasonable because there was evidence that the
25 agency had manipulated the ratings of the lowest-priced bidder from "marginal" to "acceptable" on
26 four critical factors.  A mere "marginal" rating would have rendered the bidder ineligible for the
27 award.  The court found that there was evidence that the agency's actions were "arbitrary, irrational,
28 improperly motivated, and a clear and prejudicial violation of [federal procurement law]" such that

summary judgment in the agency's favor was inappropriate. *Id*. at 1359. *Latecoere* is not helpful to Plaintiff because here, the Court has found no evidence that the Government engaged in any intentional manipulation of AMSEA's evaluation ratings. As explained above, the SSA's explanation of rating AMSEA as technically "Exceptional" was "coherent and reasonable" and should not be disturbed. *Id*. at 1356.

The Court finds that Plaintiff has not demonstrated that the Government's rating decisions here were unreasonable or that the procedure it used involved a prejudicial violation of applicable law. A government agency's decisions are entitled to substantial deference absent such a showing. Accordingly, Plaintiff has not established that it is likely to succeed on the merits with respect to its technical evaluation factors argument.

### 2. AMSEA's Key Personnel

AMSEA represented in the Key Personnel section of its bid proposal that it had commitments from a number of port engineers who were prepared to perform on the LMSR contract, if awarded. After AMSEA was awarded the Contract, however, only one of the six proposed port engineers was hired to work on the Contract. Plaintiff contends that AMSEA fraudulently misrepresented to MSC the nature of the commitments it had obtained from its proposed key personnel. Plaintiff also contends that AMSEA's inclusion of personnel in its proposal that it knew or should have known would not actually be able to work on the LMSR vessels amounts to an improper "bait and switch." Under either scenario, Plaintiff argues that the Contract should be terminated.[12]

#### a. Fraudulent Misrepresentation

The submission of a misstatement in a bid proposal, which materially influences the Government's consideration of that proposal, undermines the integrity of the procurement process and is grounds for terminating the contract award. *Planning Research*, 971 F.2d at 741. Here, Plaintiff claims that the record demonstrates that AMSEA never intended to hire the port engineers

---

[12] In supplemental briefing, Plaintiff suggests that the Court should not apply a deferent standard to its bait-and-switch argument and the Court agrees. Deference is owed to Government agencies in reviewing contract award decisions, but a competitor's fraud or bait and switch is *per se* unlawful and requires termination of the resulting contract. *Unified Architecture & Eng'g v. United States*, 46 Fed. Cl. 56, 64 (2000); *Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992).

13

1  identified in its proposal as key personnel to work on the Contract and that the Contract should thus
2  be terminated for misrepresentation.  To support this contention, Plaintiff first argues that AMSEA
3  failed, post-award, to offer jobs to two of its proposed port engineers.  Plaintiff argues that this
4  suggests that AMSEA never intended to hire them.  Second, Plaintiff contends that AMSEA
5  included in its bid proposal letters of commitment signed by the proposed port engineers warranting
6  that the signatories had reached mutual agreement with AMSEA with respect to salary, benefits, and
7  position, when, in actuality, AMSEA and the proposed employees had never discussed those issues.
8  In its recently-issued advisory opinion, the GAO agreed with Plaintiff on the latter issue, finding
9  sufficient evidence that AMSEA had misrepresented the commitments of its proposed port engineers
10 that it would sustain the bid protest.[13]  The Court agrees with the GAO that Plaintiff has raised
11 questions about AMSEA's conduct here.  However, for the following reasons, the Court finds that
12 the record is sufficiently ambiguous with regard to whether AMSEA actually engaged in fraud that
13 the Court cannot find that Plaintiff has met its burden in its request for injunctive relief.

### i. AMSEA's Failure To Hire Slaven or Erickson.

15 Plaintiff argues that AMSEA's failure, once the Contract was awarded, to offer jobs to two of
16 its proposed port engineers supports Plaintiff's contention that AMSEA engaged in fraud.  Plaintiff
17 argues that Matthew Slaven, who was identified in AMSEA's bid proposal as someone who would
18 work as a port engineer on the Contract if awarded, was never offered a job by AMSEA.  AMSEA
19 explains that shortly after it was awarded the Contract, Slaven reported to someone at AMSEA that
20 he was not available due to the increasing demands of his own business.  Slaven confirmed, under
21 oath, that although he did not specifically recall having a conversation with anyone at AMSEA, his
22 business was, indeed, very busy during that period of time.  Plaintiff also makes much of the fact
23 that Rick Erickson was not hired by AMSEA post-award.  AMSEA explains, however, that in the
24 interim period between AMSEA's submission of its proposal and the award of the Contract, two
25 things occurred.  First, Erickson had decided to retire and would only work on an LMSR vessel if it
26 were located near the Norfolk, Virginia area where he lived.  No vessel was located near Norfolk.

---

[13] The Court notes that the standard employed by the GAO in determining whether a bid protest is meritorious is different from the standard employed in the context of a motion for injunctive relief.

14

Second, based on work experiences with Erickson after the proposal was submitted, AMSEA decided that it would not hire him as an LMSR port engineer. Plaintiff's evidence, when viewed in light of the testimony of Mr. Slaven and the explanations provided by AMSEA, fails to establish a strong likelihood that AMSEA engaged in fraudulent misrepresentation when it included Slaven and Erickson in its bid proposal.[14]

### ii. Agreement Regarding Position, Salary, and Benefits

Plaintiff also contends that AMSEA submitted false commitment letters for its proposed port engineers and that this amounted to fraud. The Solicitation expressly required that offerors submit letters of commitment from each proposed key employee reflecting that a mutual agreement had been reached with respect to "position, salary, and benefits."[15] (Gardner Decl., Ex. H, Tab 3 at 129.) AMSEA submitted a bid that included letters of commitment from proposed port engineers that expressly warranted that the proposed employees were "in agreement with [AMSEA] with respect to salary, benefits, and position." Robin Booth, who was responsible for preparing AMSEA's proposal in response to the Solicitation, testified during a recent GAO hearing that he spoke with AMSEA's proposed port engineers, drafted the letters of commitment, obtained signatures, and submitted them to MSC. He admitted that he never discussed with the proposed port engineers the salary, benefits, or location where the proposed port engineers would be assigned. This establishes, according to Plaintiff, that the letters of commitment submitted by AMSEA were false and that the Contract should be terminated for misrepresentation.

AMSEA contends that its failure to discuss salary and benefits with the proposed port engineers does not reflect a lack of mutual agreement because the basic, market-based range of salaries was well-known to both AMSEA and the proposed port engineers, and the port engineers were already employed by AMSEA and were well aware of the benefits to which they were entitled.

---

[14] Having determined that Plaintiff has not sufficiently demonstrated that AMSEA's inclusion of Slaven and Erickson in its bid proposal was a misstatement, the Court need not reach the question of whether the alleged misstatement was material to MSC's award decision.

[15] Plaintiff contends that "position," here, means the location where the ships were layberthed and where the employee would have to live and work. While the Court has found nothing in the Solicitation itself assigning such a definition to the term, the Government appears to agree that Plaintiff's understanding is the correct one.

15

1  AMSEA's position is corroborated by the fact that each of the port engineers signed letters of
2  commitment which expressly stated that a mutual agreement had been reached regarding salary,
3  benefits, and position. The fact that these same port engineers have now testified before the GAO
4  that they did not have specific discussions regarding salary, benefits, and position may raise
5  questions regarding the accuracy of the warrantee in the letters of commitment that a mutual
6  agreement on those key matters had been reached. However, the record before the Court fails to
7  establish that no agreement was reached prior to submission of the letters of commitment, and *a*
8  *fortiori*, that AMSEA misrepresented this fact when it submitted letters signed by the port engineers
9  that an agreement had been reached regarding salary, benefits, and location.[16] None of the port
10 engineers testifies that no agreement was reached; they merely state that salary, benefits, and
11 location were not expressly discussed. Accordingly, upon review of the voluminous evidentiary
12 record before the Court, and the recently-issued GAO advisory opinion, the Court finds that Patriot
13 has failed to establish a strong likelihood of success on the merits of its misrepresentation claim.

### b. Bait and Switch

15 A bait and switch damages the integrity of the procurement system and violates federal
16 procurement laws. *See, e.g.,* 10 U.S.C. § 2304(a)(1)(A) (requiring "full and open competition" in
17 procurement). To demonstrate a bait and switch, a bid protestor must show that (1) the awardee
18 represented in its proposal that it would rely on certain specified personnel in performing the
19 services; (2) the agency relied on this representation in evaluating the proposal; (3) it was
20 foreseeable that the individuals named in the proposal would not be available to perform the contract
21 work; and (4) personnel other than those proposed are performing the services. *Unified*
22 *Architecture*, 46 Fed. Cl. at 65 (denying a preliminary injunction, reasoning that the awardee's post-
23 award advertisement for a program manager was not evidence of intent by the awardee to engage in
24 a bait and switch.) "Termination of a contract award based on the proposal is appropriate where
25 such a misrepresentation materially influences an agency's evaluation of an offeror's proposal." *Id*.
26 at 64. Here, according to Plaintiff, AMSEA engaged in a personnel bait and switch, MSC relied on

---

[16] Again, having determined that Plaintiff has not sufficiently demonstrated that AMSEA's letters of commitment contained misstatements, the Court need not reach the question of whether those alleged misstatements were material to MSC's award decision.

16

1    AMSEA's misrepresentations when it credited AMSEA for the identified personnel, and AMSEA's
2    Contract should thus be terminated.[17]
3          The Court finds that Plaintiff has not demonstrated that it was foreseeable to AMSEA when
4    it submitted its bid proposal that the proposed port engineers would not be available to work on the
5    LMSR Contract. *Unified Architecture*, 46 Fed. Cl. at 65.  Although several of the port engineers
6    identified by AMSEA in its proposal became unavailable to work on the Contract, it is not clear that
7    AMSEA knew or should have known that this would occur.  This is particularly true in light of the
8    amount of time that had elapsed – nearly one year – between AMSEA's submission of its initial bid
9    on February 18, 2003, and the date on which it began substituting personnel (January 10, 2004).
10   *Consol. Eng'g Servs. v. United States*, 2005 U.S. Claims LEXIS 100, *57 (Fed. Cl. Feb 14, 2005).
11   Moreover, the Solicitation expressly recognizes that identified key personnel may, subsequent to
12   submission of the proposal, become unavailable, and allows the awardee to substitute identified
13   personnel with equally-qualified or better-qualified personnel, which AMSEA has done here.  (*See*
14   Gardner Decl, Ex. H, Tab 3 at 77–78.)  Accordingly, the Court finds that Plaintiff has not
15   demonstrated that the third requirement of a bait and switch has been met here.
16         —
17         Government agencies are entitled to substantial deference in their contract award decisions.
18   Unless the agency is shown to have made its decision unreasonably, courts will not intervene.  Here,
19   in light of that deferent standard, the Court finds that Plaintiff has failed to demonstrate a likelihood
20   of success on the merits of its claim that the procurement process was flawed and that MSC awarded
21   the Contract to AMSEA in error.
22         With respect to Plaintiff's claims regarding AMSEA's misconduct in the procurement
23   process, no deference is due.  However, the end result is the same on those claims.  Regarding the
24   bait and switch argument, the Court finds that Plaintiff has not demonstrated a likelihood of success
25   on the merits.  Regarding Plaintiff's contention that AMSEA engaged in fraud by proposing key
26   personnel it did not intend to hire, the Court finds that Plaintiff has raised questions about AMSEA's

---

[17] Citing *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 855 (1999), the Government suggests that a finding of agency bad faith is required to find that a bait and switch occurred here.  The Court disagrees.

conduct but has not shown a strong likelihood of success on the merits.

### B. Irreparable Harm

Plaintiff correctly states that it will suffer irreparable harm if a preliminary injunction does not issue because a disappointed bidder cannot recover anticipated profits. *See Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305 (2004) (finding irreparable harm because protesting bidder is entitled only to bid preparation costs; the only way to recover lost profits is by equitable relief). Defendant and Intervenor-Defendant AMSEA contend that because Plaintiff will suffer only economic injuries if the Government is not enjoined, Plaintiff has failed to establish irreparable harm. The Court disagrees.

"The usual rule is that mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages when the claim is resolved on the merits." *Id*. at 317. But "[i]f lost profits do not constitute irreparable harm, then a protester that seeks to displace a putative awardee automatically fails to meet one of the requirements for injunctive relief." *Id*. Such a result would be unjust and has been rejected. "Loss of anticipated profits . . . can be remedied solely by injunctive relief." *Id*. Thus, the Court finds that Plaintiff has established that it will suffer irreparable harm if the Government transitions the operation and management of the LMSRs to AMSEA before the claims raised in its complaint are adjudicated.

### C. Balance of Hardships

Defendant argues that even if Plaintiff has established irreparable harm, a balancing of hardships weighs in the Government's favor. According to Defendant, the Government and AMSEA would suffer serious harm if the Government were enjoined from completing the turnover of the LMSRs to AMSEA. First, the Government claims that it will incur substantial expense if the transition is further delayed because it will be forced to wait another year to complete the scheduled turnover and AMSEA may seek to recover $130,000 in overhead expenses for every additional month of delay. Second, if the injunction were to issue, AMSEA would suffer a substantial monetary loss – in part due to lost profits on the contract, but also because it has already begun to mobilize to perform on the contract. *The Cube Corp. v. United States*, 46 Fed. Cl. 368, 388 (2000) (noting that economic harm to awardee should be considered). With respect to the Government's

and AMSEA's injuries, Plaintiff contends that the balance still tips in favor of granting injunctive relief. The Court finds both sides have demonstrated the potential for substantial harm. In any event, even assuming that Patriot has raised serious questions regarding the likelihood of success on its misrepresentation claim, the balance of hardships does not tip sharply in Patriot's favor.

### D. Public Interest

Plaintiff contends that the public interest is served by ensuring that a procurement process "conforms to applicable procurement regulations." *Hawaiian Dredging*, 59 Fed. Cl. at 318 (citations omitted). Additionally, Plaintiff argues that the public would actually be benefitted by the delay because with Patriot continuing to operate and maintain the LMSRs at its previously contracted-for price (lower than AMSEA's proposed price), the Government and the taxpayers would pay less for exceptional services. Plaintiff is right that "savings to the Government . . . also should be taken into account." *Hawaiian Dredging*, 59 Fed. Cl. at 318. However, its argument, in this particular case, is undercut somewhat by the Government's representation that AMSEA would bill the Government (and thus, the taxpaying public) $130,000 per month if there is further delay.

The Intervenor unions also contend that they will suffer irreparable harm if the transfer of the LMSRs is not enjoined because those employed on the LMSRs will be out of work if Patriot loses this contract. The unions contend that their members are unwilling to work for AMSEA because they would lose hard-earned seniority and pension status. While the turnover of the LMSRs is clearly a hardship for the unions and their members, the Court notes that the honorable sailors and merchant marines and other essential personnel operating and maintaining these particular ships were never guaranteed that Patriot would always have the LMSR contract with the Government.

The Government argues that denying Plaintiff's motion would serve the public's "strong . . . interest in avoiding disruptions in procurement" and in "minimizing the costs of federal procurements." *Shoals*, 877 F.2d at 888; *Vanguard Sec., Inc. v. United States*, 20 Cl. Ct. 90, 113 (1990). Even more significantly, at issue here is the operation and maintenance of vessels that are vital to the nation's military capability. The public most certainly has a strong interest in avoiding a substantial disruption in the operation of such ships, particularly when they may need to be deployed at a moment's notice.

The Court finds that while Plaintiff and the Intervenor unions have shown that the public will be harmed if the injunction does not issue, those concerns are, at least slightly outweighed by the public's interest in ensuring that essential military vessels operate as smoothly as possible. Accordingly, this factor tips in favor of denying the relief sought.

### E.     Application of Preliminary Injunction Standard

The Court finds that both parties have demonstrated the potential for serious harm here. In such a situation, the plaintiff must show a strong likelihood of success on the merits. This is particularly true in the context of a motion for injunctive relief against the Government and where the relief sought is, in large part, mandatory. Plaintiff has not met its high burden. The Government's decision to award the ship operation contract to AMSEA was reasonable and is entitled to substantial deference. With respect to Plaintiff's contention that AMSEA engaged in fraud warranting termination of the Contract, the Court finds that Plaintiff has raised questions about the integrity of the procurement process. However, this is not enough to demonstrate a strong likelihood of success on the claim's merits. Plaintiff has also failed to demonstrate that the balance of harms tips sharply in its favor. Accordingly, Plaintiff's motion for injunctive relief must fail.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for preliminary injunction.

**IT IS SO ORDERED**

Dated: May 15, 2005

/s/ 
MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE