1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

PATRIOT CONTRACT SERVICES,

10                                          No. C 04-5428 MJJ

              Plaintiff,
11                                          **AMENDED ORDER DENYING MOTION
                                            FOR PRELIMINARY INJUNCTION**
      v.
12

13   UNITED STATES,

14            Defendant.
     _____/
15

16                      **INTRODUCTION**

17        Before the Court is Plaintiff Patriot Contract Services' ("Plaintiff") motion for preliminary

18   injunction in this maritime disappointed bidder case.  Intervenors Sailors' Union of the Pacific

19   ("SUP"), International Organization of Masters, Mates & Pilots ("MMP"), and Pacific Coast Marine

20   Fireman, Oilers, Watertenders and Wipers ("MFOW") support Plaintiff's motion.[1]  Defendant

21   United States and Intervenor-Defendant American Overseas Marine Corporation ("AMSEA")

22   oppose the motion.  For the following reasons, the Court **DENIES** Plaintiff's motion.

23                   **FACTUAL BACKGROUND**

24        For four years running, Plaintiff Patriot Contract Services ("Plaintiff or "Patriot") operated

25   _____

26        [1] The Court granted the unions' motions to intervene on April 25, 2005.  At oral argument on
     the instant preliminary injunction motion, the Government alerted the Court to a statute, 28 U.S.C. §
27   1292(d), which requires a 60-day stay on all proceedings following a district court's ruling on a motion
     to transfer to the U.S. Court of Federal Claims.  On April 13, 2005, the Court denied the Government's
28   motion to transfer.  Thus, the Government contends that the 60-day stay in effect bars the unions from
     intervening.  The Court disagrees.  The unions expressly sought to intervene for the limited purpose of
     being heard on Plaintiff's motion for preliminary injunction.  The granting of preliminary or injunctive
     relief is expressly excepted from the stay rule announced in § 1292(d).  Accordingly, the Court finds
     that the unions' limited intervention on that issue is similarly excepted from the 60-day stay.

United States District Court
For the Northern District of California

and maintained eleven Large Medium Speed Roll-On/Roll-Off ("LMSR") ships for the United States Navy Military Sealift Command ("MSC").  LMSR vessels are a key component of the surge sealift capacity of the United States armed forces.  The operator of the LMSR ships must maintain the vessels and be prepared to mobilize a full crew to deploy in support of military missions throughout the world on short notice.

To maintain and operate the LMSRs, Plaintiff employs approximately 300 unlicensed deck personnel who are SUP members, approximately 100 unlicensed deck personnel who are MMP members, and 100 unlicensed engine department crew who are MFOW members.  Plaintiff has collective bargaining agreements ("CBAs") with all three unions.

On December 11, 2003, MSC issued Request for Proposals Number N00033-04-R-5300 (the "Solicitation"), soliciting bids for the worldwide operation and maintenance of its eleven LMSR ships.[2]  According to the Solicitation, the ship operation contract would be awarded to the offeror whose proposal "represents the best overall value to the Government, given the outcome of the Government's evaluation of each offeror's technical proposal, past performance and price." (Declaration of Bryant E. Gardner ("Gardner Decl."), Ex. H, Tab 3, § M-1 at 134.)[3]  The Solicitation expressly noted that the technical evaluation factors would be more important than past performance and that the technical factors and past performance, taken together, would be more important than price.  (*Id*. at 135.)  The importance of price, however, would increase as the differences in evaluated technical quality and in past performance among the offerors decreased, such that price could "become the determinative factor for making [the] award."  (*Id*. at 138.)  The five identified technical evaluation factors, in order of importance, were Technical Experience & Capability, Management of Purchasing Systems and Reimbursables, Management Organization (including Organizational Structure and the identification of Key Personnel), Management Systems, and Participation of Small Business, HUBZone Small Businesses, Small Disadvantaged Business, Women-Owned Business Concerns.  As part of the first factor, MSC would consider the bidder's

---

[2] Two of the eleven LMSRs are not relevant here as they were set aside for small business participation.  At issue here is the operation and maintenance of only nine LMSRs.

[3] Exhibit H to the Bryant Declaration consists of the Solicitation, AMSEA's response to the Solicitation, and Plaintiff Patriot's response to the Solicitation.  These documents were filed under seal.

experience and demonstrated ability to maintain and operate "ships of similar type and/or size" to the LMSRs. (*Id.* at 136.)  With respect to Key Personnel, the Solicitation required offerors to "submit up-to-date resumes of all identified key personnel to be employed in accomplishing the stated requirements" and letters of commitment from each identified worker, "stating his/her intention on the resultant contract." (*Id.* at § L-19, ch. 3 at 128–29.)  The offerors' Past Performance rating would be based, in large part, upon feedback from customers on relevant present and past contracts. (*Id.* at 133.)

Plaintiff Patriot and Intervenor AMSEA were two of five entities that submitted bids in response to the Solicitation.  According to Patriot, Patriot had vast experience operating the very LMSR vessels at issue whereas AMSEA had only negligible experience with LMSRs of any type and very limited experience with twin screw diesel powered ships, which the LMSR vessels at issue are.  Additionally, according to Plaintiff, Patriot was the only operator of all but one of the Government's BOB HOPE class vessels, which comprise seven of the vessels at issue here,[4] and AMSEA lacked any experience operating BOB HOPE class vessels.  According to Plaintiff Patriot, there is no dispute that MSC's evaluation team recognized that Patriot provided the best technical and management solution for the Government.  However, Patriot and AMSEA were assigned nearly identical technical scores.[5]  With respect to price, AMSEA's bid was $6.5 million (or about 5.4%) lower in price than Patriot's.

On August 31, 2004, the Government awarded the ship operation contract (the "Contract") for the operation and maintenance of the nine LMSR vessels to AMSEA.[6]  The MSC's Source

---

[4] The other two vessels at issue are part of the SHUGHART class of LMSR ships.

[5] Both bidders were rated "Exceptional" in the most important subcategory of Technical Experience & Capability, in the second most important subcategory of Management of Purchasing Systems and Reimbursables, and for Property Control (one of two factors in the fourth-ranked Management Systems subcategory).  Both bidders were rated "Very Good" for Organizational Structure (one of two factors in the third-ranked Management Organization subcategory) and for the least significant (for evaluation purposes) Participation of Small Business, HUBZone Small Businesses, Small Disadvantaged Business, Women-Owned Business Concerns subcategory.
Patriot was rated "Exceptional" on its Key Personnel (one of two factors in the Management Organization subcategory) and for Quality (the other Management Systems factor) while AMSEA was only rated "Very Good" in those categories.

[6] SUP, MMP, and MFOW do not have CBAs with AMSEA.

1    Selection Authority ("SSA"), which evaluated the bid proposals, prepared a Decision Memorandum

2    explaining its rationale for choosing AMSEA.  According to the SSA, AMSEA's "Exceptional"

3    technical rating was based on its demonstrated extensive experience and capability in the

4    maintenance and operation of ships of a similar size and type to the LMSRs because it had operated

5    Fast Sealift Ships ("FSS"), which are of similar size and type, and Maritime Prepositioning Ships

6    ("MPS") and Ready Reserve Force ("RRF") ships, which are of similar type to the LMSR vessels.

7    The SSA explained that while AMSEA and Patriot were determined to be technically equivalent and

8    their past performance ratings the same, AMSEA's proposed price was lower than Patriot's such that

9    AMSEA's proposal was the best overall value to the Government.  (Declaration of John Henry

10   ("Henry Decl."), Ex. A at 13.)

11        After the Contract was awarded to AMSEA, AMSEA began advertising for port engineers

12   because post-award several of the six port engineers identified in the bid proposal declined to work

13   on the LMSR Contract.

14        Patriot timely filed a bid protest with the United States Government Accountability Office

15   ("GAO").  Pursuant to the Competition in Contracting Act, MSC stayed performance of the Contract

16   pending the adjudication of the GAO protest.  31 U.S.C. § 3553(c)-(d).  This meant that during that

17   time, Patriot continued to maintain and operate the LMSR vessels at issue.  Before the GAO issued

18   its final decision, Patriot withdrew its protest and filed the instant lawsuit for declaratory relief.[7]

19   When MSC then decided, in accordance with the Contract, to effect the transition of the operation

20   and maintenance of the LMSR vessels from Patriot to AMSEA, Plaintiff filed the instant motion for

21   preliminary injunction.  Plaintiff seeks to enjoin Defendant from transitioning the operation of the

22   LMSRs from Patriot to AMSEA pursuant to the Contract, which, Plaintiff claims, was awarded

23   unlawfully under federal procurement law.  At the hearing on this motion, the Court was informed

24   _____

25        [7] At Intervenor-Defendant AMSEA's request, in a March 15, 2005 Order, the Court requested
     that the GAO provide an advisory opinion to the Court by April 15, 2005.  On March 22, 2005, Dan
26   Gordon of the GAO contacted the Court and admitted that the GAO would be hard-pressed to meet that
     deadline.  The Court then issued an Order respectfully requesting that the GAO provide its advisory
27   opinion before the hearing on the instant motion, if at all possible, but declaring that the hearing would
     proceed in any event.  The Court received the GAO's advisory opinion on May 10, 2005.  In that
28   opinion, the GAO advised that in light of new evidence that AMSEA engaged in fraudulent
     misrepresentation with regard to the key personnel identified in its bid proposal, it would sustain the bid
     protest and require the Government to begin the procurement process anew.

1   that the transition of three of the vessels is complete.  The transition process was initiated on April

2   25, 2005 as to three others, and is scheduled to be complete on May 6, 2005.  With respect to the

3   three remaining ships, transition has not yet begun but is scheduled to be complete by June 30, 2005.

**LEGAL STANDARD**

5          The basic function of a preliminary injunction is to preserve the status quo pending a

6   determination of the outcome on the merits.  *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d

7   701, 704 (9th Cir. 1988).  The status quo means the last uncontested status which preceded the

8   pending controversy.  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000).

9   Courts apply one of two standards to determine whether a preliminary injunction should issue.  To

10  meet the "traditional" test, the movant must establish: (1) a strong likelihood of success on the

11  merits; (2) the possibility that the movant will suffer irreparable harm if the injunction does not

12  issue; (3) that the balance of hardships favors its case; and (3) that the public interest favors granting

13  the injunction.  *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir. 1983).  To prevail under

14  the "alternate" test, the movant must demonstrate either a combination of probable success on the

15  merits and the possibility of irreparable injury, or that serious questions are raised and that the

16  balance of hardships tips sharply in its favor.  *Id.*; *see also Diamontiney v. Borg*, 918 F.2d 793, 795

17  (9th Cir. 1990).  The formulations under the "alternate" test represent two points on a sliding scale in

18  which the required degree of irreparable harm increases as the probability of success decreases.

19  *Diamontiney*, 918 F.2d at 795.  Under either formulation, at an "irreducible minimum," the moving

20  party must show a fair chance of success on the merits.  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313,

21  1319 (9th Cir. 1994).

22         Injunctive relief will not be granted "unless the facts and law clearly favor the moving

23  party."  *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).  In reviewing motions for

24  mandatory relief, "courts should be extremely cautious about issuing a preliminary injunction."

25  *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984).  Additionally, "any injunction

26  regarding government functions is generally permitted only in 'extraordinary circumstances.'"  *Rizzo*

27  *v. Goode*, 423 U.S. 362, 379 (1976).

28         **ANALYSIS**

*United States District Court*
For the Northern District of California

5

1    Plaintiff Patriot contends that the bid solicitation process employed here and the

2    Government's ultimate decision to award the Contract to AMSEA violated federal law governing

3    military agencies' procurement of supplies and services.  Plaintiff accordingly seeks a preliminary

4    injunction to prevent Defendant from transitioning the operation and maintenance of the LMSRs to

5    AMSEA pending the outcome of this lawsuit.

6    **I.    Standard of Review**

7        A significant threshold matter, here, is the appropriate standard of review that the Court

8    should employ in reviewing the agency's evaluation process and ultimate decision to award the

9    LMSR Contract to AMSEA.  Defendant and Intervenor-Defendant AMSEA contend that the

10   appropriate standard of review in this case is that provided by the Administrative Procedure Act

11   ("APA"), 5 U.S.C. §§ 702, *et seq*.  Plaintiff, however, claims that because this suit is brought under

12   the Suits in Admiralty Act ("SIAA"), 46 U.S.C. § 741, *et seq.*, the APA does not apply.  The Court

13   agrees with the Government.

14       **A.    The APA Standard of Review Applies Here.**

15       Bid protests, even those brought in federal district courts rather than in the U.S. Court of

16   Federal Claims pursuant to the Tucker Act, are generally governed by the APA standard of review.

17   *See, e.g., Latecoere Int'l, Inc. v. U.S. Dept of the Navy*, 19 F.3d 1342 (11th Cir. 1994); *Kinnett*

18   *Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir. 1978); *Continental Heller Corp. v. Secretary*

19   *of Navy*, 1998 U.S. Dist. LEXIS 16326 (N.D. Cal. June 8, 1998); *DTH Management Group v. Kelso*,

20   844 F. Supp. 251 (E.D. N.C. 1993).  The deferent APA standard of review has also been adopted by

21   courts in admiralty cases to review non-adjudicatory agency activities.  *See United Sates v. Hyundai*

22   *Merchant Marine, Ltd.*, 172 F.3d 1187, 1191 (9th Cir. 1999).

23       Plaintiff contends that because it does not allege APA violations,[8]  and because the Court has

24   SIAA jurisdiction (and not Tucker Act jurisdiction, which confers jurisdiction over non-maritime

25   bid protests with the U.S. Court of Federal Claims and requires APA's standard of review), the APA

26

27   _____

28       [8] Plaintiff's original complaint employed the caption, "Administrative Procedure Act Case," and described in detail, in the Summary of the Action section, the APA standard of review in cases appealing a government agency's award of a contract.  In its subsequent amended complaints, including the operative Second Amended Complaint, all explicit references to the APA have been removed.

*United States District Court*
For the Northern District of California

6

United States District Court

For the Northern District of California

1    does not apply.  Admiralty lawsuits against the Government brought pursuant to the SIAA "shall

2    proceed and shall be heard and determined according to the principles of law and to the rules of

3    practice obtaining in like cases between private parties."  46 U.S.C. Appx. § 743.  Plaintiff contends

4    that this means that the MSC's decision should be reviewed just as a private entity's contract

5    decision would be and is not entitled to any government agency deference.[9]  The Court disagrees.

6         Having located no case law that suggests that the SIAA language cited above requires federal

7    courts to review agency contract decisions *without* deference, the Court is guided by the deferent

8    standard of review employed in the non-SIAA bid protests involving government agency decisions

9    noted above,[10] as well as by the longstanding *Chevron* rule.  The *Chevron* rule states that "courts

10   should respect an executive-branch agency's reasonable interpretation of statutes and regulations the

11   agency is charged with administering."  *Shoals Amer. Industries, Inc. v. United States*, 877 F.2d 883,

12   888 (11th Cir. 1989) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467

13   U.S. 837 (1984).  This is particularly true in procurement cases as there is a "strong public interest in

14   avoiding disruptions in procurement, and for withholding judicial interjection unless it *clearly*

15   appears that the case calls for an assertion of an overriding public interest."  *Id.* (emphasis in

16   original); *see also Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973) ("in cases

17   involving government procurement of contracts, courts have traditionally applied [a] . . . deferential

18   standard of review whereby only agency actions that have no 'reasonable' or 'rational' basis are

19   deemed contrary to law.")  Accordingly, the Court finds that a deferent standard of review is

20   appropriate in assessing MSC's solicitation process and award decision.  Because the APA standard

21

22        [9] Plaintiff argues, in the alternative, that if the APA standard of review applies, MSC's actions
23   were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" such
     that it violated the APA.  (Motion at 6 n.4.)

24        [10] The Government cites the *Puglia Engineering* case – in which a maritime bid protest action
25   was brought against the Government pursuant to the SIAA – to support its contention that the APA
     standard of review should be employed here.  *Puglia Engineering v. U.S. Coast Guard*, 2004 U.S. Dist.
26   LEXIS 24257, *1 (N.D. Cal. Nov. 19, 2004).  While the Court agrees that the APA is the appropriate
     standard of review, the *Puglia* case is not dispositive on that point.  In *Puglia*, which this Court recently
27   decided, the Court applied the APA's deference-to-the-agency standard of review in assessing a
     disappointed bidder's motion to enjoin the Government from commencing repairs on a Coast Guard
28   cutter.  However, the parties in that case did not disagree as to the appropriate standard of review.
     Accordingly, *Puglia Engineering* is not determinative of whether the APA standard applies here or
     whether the MSC's decision deserves no deference, as Plaintiff urges.

7

1   of review is employed in bid protests, the Court will employ that standard here.

2       **B.      The APA Standard of Review**

3           According to the APA, a court may only invalidate agency decisions if they were "arbitrary,

4   capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

5   Administrative decisions are entitled to a presumption of validity, and "absent a showing of arbitrary

6   action, [courts] must assume that the agencies have exercised this discretion appropriately."  *Kleppe*

7   *v. Sierra Club*, 427 U.S. 390, 412 (1976).  This standard of review is highly deferential.  "Review

8   under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its

9   judgment for that of the agency."  *Western Radio Servs. Co. v. Espy*, 79 F.3d 896, 900 (9th Cir.

10  1996).  A court may reverse an agency decision:

11          only if the agency relied on factors Congress did not intend it to consider,
            entirely failed to consider an important aspect of the problem, offered an
12          explanation that ran counter to the evidence before the agency, or offered
            one that is so implausible that it could not be ascribed to a difference in
13          view or the product of agency expertise.

14  *Id*.

15          In the context of disappointed bidder cases, courts have employed the APA standard of

16  review and have held that the protesting contractor must demonstrate either (1) the procurement

17  official's decision has no rational basis, or (2) the procurement procedure involved a clear and

18  prejudicial violation of applicable statutes or regulations.  *Kinnett Dairies*, 580 F.2d at 1271.

19  Agencies making contract award decisions "are entitled to exercise discretion upon a broad range of

20  issues confronting them, including 'considerations of price, judgment, skill, ability, capacity, and

21  integrity' in the selection of businesses with whom the government will enter into contracts."

22  *Latecoere*, 19 F.3d at 1356 (citation omitted).  "Accordingly, reviewing courts should be concerned

23  with whether the contracting agency provided a coherent and reasonable explanation of its exercise

24  of discretion."  *Id*.  Thus, if a reviewing court finds a reasonable basis for the agency's decision, it

25  should "stay its hand" and should not "intervene in the procurement process."  *Id*.

26  **II.    Plaintiff's Motion For Preliminary Injunction**

27          Plaintiff Patriot alleges that MSC's evaluation process and ultimate decision to award the

28  Contract to AMSEA over Patriot violated federal procurement law.  Plaintiff also alleges that the

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    solicitation process was tainted by AMSEA's fraudulent misrepresentations or, at least, a "bait and

2    switch."  In the procurement of goods and services, federal agencies are required to "obtain full and

3    open competition through the use of competitive procedures in accordance with the requirements of

4    this chapter and the Federal Acquisition Regulation."  10 U.S.C. § 2304(a)(1)(A).  "In preparing for

5    the procurement of property or services, the head of an agency shall — (i) specify the agency's

6    needs and solicit bids or proposals in a manner designed to achieve full and open competition for the

7    procurement; . . . and (iii) develop specifications in such manner as is necessary to obtain full and

8    open competition with due regard to the nature of the property or services to be acquired."  10

9    U.S.C. § 2305(a)(1)(A).  The agency shall evaluate the bids submitted "based solely on the factors

10   specified in the solicitation."  10 U.S.C. § 2305(b)(1).

11       Plaintiff seeks to enjoin Defendant from transitioning dominion over the LMSRs from Patriot

12   to AMSEA pending the outcome of a trial on Plaintiff's complaint.  Toward that end, Plaintiff

13   contends that it will likely succeed on the merits of its complaint, that it will suffer irreparable injury

14   unless the Court grants injunctive relief, that the balance of hardships tips in its favor, and that the

15   public interest favors enjoining the Government from transitioning operation of the LMSRs to

16   AMSEA.  Defendant United States argues that Plaintiff is not likely to prevail on the merits because

17   AMSEA's proposal represented the best overall value for the Government, and that its decision to

18   award AMSEA the Contract was reasonable, expressly allowed by regulations, and warrants

19   deference.  Defendant also contends that AMSEA's proposal was not tainted by fraud nor did

20   AMSEA engage in a bait and switch.  Defendant additionally argues that the economic harm

21   Plaintiff will suffer does not constitute irreparable harm, and that the balance of hardships and the

22   public interest both weigh in favor of denying the motion, particularly in light of the inevitable

23   operational problems that any delay in the transition will cause, and the substantial costs to AMSEA,

24   the Government, and taxpayers if the Government is enjoined from turning the vessels over to

25   AMSEA.

26       **A.    Likelihood of Success on the Merits**

27       Plaintiff's claims on the merits reduce to two basic arguments: (1) the Government violated

28   federal procurement law by failing to evaluate AMSEA's and Patriot's bids according to the

1    Solicitation's stated selection criteria; and (2) the Contract should be terminated because AMSEA

2    proposed to employ key personnel who were not hired once the Contract was awarded.

3                    **1.        The Government's Evaluation of the Proposals**

4            Plaintiff contends that Defendant evaluated the offerors' technical and management

5    proposals and their past performance in such a way that either ignored or masked Patriot's superior

6    experience and capability with respect to operating and maintaining ships of a similar size and type

7    in a comparable operating environment to that contemplated under the Solicitation.  Plaintiff argues

8    that as the incumbent operator of the LMSRs, its technical expertise was far superior to AMSEA's

9    and that Patriot should have been rated higher than AMSEA on the technical factors (or that

10   AMSEA should have been rated lower than it was).  Plaintiff also contends that the MSC improperly

11   credited AMSEA with prior experience that was not as relevant as Patriot's.  Finally, Patriot argues

12   that the MSC departed from the best value scheme described in the Solicitation by ultimately

13   choosing the lowest-priced bid.  The Court finds, particularly in light of the deference owed

14   Government agencies in making contract award decisions, that Plaintiff has not demonstrated that it

15   is likely to succeed on the merits of its claim that violations of federal procurement law occurred

16   here.

17           MSC's SSA provided reasonable explanations for AMSEA's ratings.  While Patriot had

18   significant experience operating and administering the very ships at issue here, AMSEA had

19   operated the Government's eight Fast Sealift Ships for four years, including deployment to Iraq, five

20   Ready Reserve Force ("RRF") Roll-On/Roll-Off ships ("RO/ROs"), four Maritime Prepositioning

21   Ships, and the USNS STOCKHAM, all at the same time.  According to the SSA's report, all of these

22   ships are "of the same type as the LMSRs; the eight FSS are of the same size as the LMSRs; they all

23   perform the same type of mission; and the STOCKHAM is a modified LMSR."  (Henry Decl, Ex. A

24   at 3.)  Plaintiff contends that none of these ships were twin-propeller shaft diesel engines like the

25   LMSRs.  While it may be true that AMSEA's technical experience was not as relevant as AMSEA's,

26   the Court notes that the Solicitation expressly stated that the Government was interested in the

27   competitors' experience with ships of similar size and type and did not require that the bidders have

28   experience with the exact vessels at issue to be rated "Exceptional."  As the SSA reasonably

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   explained, AMSEA earned its overall "Exceptional" rating in many of the technical evaluation

2   factors because "their approach has a high probability of meeting requirements with limited

3   technical risk." (*Id*.)  Moreover, the Court is not in a position to substitute its judgment for the

4   Government's in this highly technical decision-making process.  Plaintiff has not demonstrated that

5   the Government was unreasonable in rating AMSEA exceptional in this category.

6        With respect to repair experience, the SSA noted that AMSEA had "performed over 42

7   drydockings/overhauls on its . . . vessels" and had conducted "within budget" drydockings with a

8   near perfect completion-on-time record.  (*Id*. at 6.)  The SSA also observed AMSEA's long history

9   of operating and managing ships for the Government, particularly in war efforts, and its

10  demonstrated ability to operate "in remove areas and under severe and dangerous conditions."  (*Id*.)

11  Patriot's repair experience may have been more relevant, but that does not make AMSEA's

12  experience less than exceptional nor does it render the agency's rating decision unreasonable.

13       With respect to the Key Personnel factor, the SSA provided a reasonable explanation for

14  AMSEA's "Very Good" rating.  (*Id*. at 6.)  Even if Plaintiff is right that its personnel proposal was

15  superior to AMSEA's, it appears that MSC accounted for the differences by giving Patriot a higher

16  rating on that factor.  Patriot has not demonstrated that the "Very Good" rating was unreasonable.

17       With respect to Plaintiff's contention that its expertise and experience was ignored by the

18  MSC in its evaluation, the Court disagrees.  Plaintiff was rated "Exceptional" for nearly every sub-

19  factor in the technical category, the most important of the evaluation categories.[11]  The evaluation

20  results clearly reflect Patriot's technical expertise here.  Plaintiff's contention that the rating system

21  should allow for finer distinctions between offerors is without merit.  The MSC is entitled to use an

22  adjectival rating system as "procurement officials have 'broad latitude in determining the particular

---

24       [11] Plaintiff specifically complains that it was improperly given only a "Very Good" rating in the
Organizational Structure sub-factor.  (AMSEA was also rated "Very Good" for this sub-factor.)
25  Plaintiff contends that MSC's explanation for the "Very Good" rating, that Patriot had not "cited any
examples of the use of innovative or state of the art approaches," was improper since nowhere in the
26  Solicitation is there any indication that evaluation under this sub-factor would turn on innovative or state
of the art approaches.  Because MSC failed to make its award decision based solely on the factors
27  specified in the Solicitation, Plaintiff argues, the evaluation process was flawed.

28       While the Solicitation does not expressly say that "innovative" or "state-of-the-art" approaches
will be taken into consideration, the Court finds that the Government's explanation for the rating is not
so unreasonable to warrant judicial intervention.

11

method of proposal evaluation to be utilized.'" *Delta Dental Plan of Cal. v. Perry*, 1996 U.S. Dist. LEXIS 2086, * 44–45 (N.D. Cal. Feb, 20, 1996) (citation omitted).  The agency's judgments about "slight qualitative differences" in proposals are "not subject to rational legal objections unless a clear showing of unreasonableness is made." *Id.* at *51 (citation omitted).   Here, Plaintiff has not demonstrated that the MSC was unreasonable.  The Court finds that the SSA's explanation for assigning AMSEA the highest technical rating is reasonable and should not be disturbed.

Plaintiff claims that Defendant improperly conducted its "best value" analysis, effectively converting the procurement into one where price, rather than technical merit, became the decisive evaluation criterion.  The Court disagrees.  The Solicitation expressly states that where the differences among the technical and past performance ratings decrease, price becomes a more important factor, and where all other factors are equal, price "may become the determinative factor for making [the] award."  (Gardner Decl., Ex. H, Tab 3, § M-1 at 138.)  Here, Patriot's and AMSEA's respective technical evaluation ratings were essentially the same – "Exceptional."  Their past performance was also rated "Exceptional."  With the most important factors being equal, MSC was entitled, based on the express language of the Solicitation, to choose AMSEA whose bid price was $6.5 million lower than Patriot's.  As discussed above, Plaintiff has not demonstrated that the MSC's evaluation of the technical and past performance factors was improper.  Accordingly, Plaintiff has not demonstrated a likelihood of success on the merits that MSC failed to properly employ the best value evaluation method.

The *Latecoere* case, cited by Plaintiff to support its argument that the MSC improperly evaluated the offerors' bids, is inapposite.  19 F.3d 1342.  In that case, the Eleventh Circuit reversed a lower court's grant of summary judgment in the government agency's favor.  The court found that while courts should generally be deferent to a government agency's contract decisions, the Navy's contract award decision in that case was unreasonable because there was evidence that the agency had manipulated the ratings of the lowest-priced bidder from "marginal" to "acceptable" on four critical factors.  A mere "marginal" rating would have rendered the bidder ineligible for the award.  The court found that there was evidence that the agency's actions were "arbitrary, irrational, improperly motivated, and a clear and prejudicial violation of [federal procurement law]" such that

United States District Court
For the Northern District of California

1   summary judgment in the agency's favor was inappropriate. *Id*. at 1359. *Latecoere* is not helpful to

2   Plaintiff because here, the Court has found no evidence that the Government engaged in any

3   intentional manipulation of AMSEA's evaluation ratings. As explained above, the SSA's

4   explanation of rating AMSEA as technically "Exceptional" was "coherent and reasonable" and

5   should not be disturbed. *Id*. at 1356.

6          The Court finds that Plaintiff has not demonstrated that the Government's rating decisions

7   here were unreasonable or that the procedure it used involved a prejudicial violation of applicable

8   law. A government agency's decisions are entitled to substantial deference absent such a showing.

9   Accordingly, Plaintiff has not established that it is likely to succeed on the merits with respect to its

10  technical evaluation factors argument.

11                    **2.      AMSEA's Key Personnel**

12         AMSEA represented in the Key Personnel section of its bid proposal that it had

13  commitments from a number of port engineers who were prepared to perform on the LMSR contract,

14  if awarded. After AMSEA was awarded the Contract, however, only one of the six proposed port

15  engineers was hired to work on the Contract. Plaintiff contends that AMSEA fraudulently

16  misrepresented to MSC the nature of the commitments it had obtained from its proposed key

17  personnel. Plaintiff also contends that AMSEA's inclusion of personnel in its proposal that it knew

18  or should have known would not actually be able to work on the LMSR vessels amounts to an

19  improper "bait and switch." Under either scenario, Plaintiff argues that the Contract should be

20  terminated.[12]

21                    **a.      Fraudulent Misrepresentation**

22         The submission of a misstatement in a bid proposal, which materially influences the

23  Government's consideration of that proposal, undermines the integrity of the procurement process

24  and is grounds for terminating the contract award. *Planning Research*, 971 F.2d at 741. Here,

25  Plaintiff claims that the record demonstrates that AMSEA never intended to hire the port engineers

26  ────────────

27         [12] In supplemental briefing, Plaintiff suggests that the Court should not apply a deferent standard
    to its bait-and-switch argument and the Court agrees. Deference is owed to Government agencies in
28  reviewing contract award decisions, but a competitor's fraud or bait and switch is *per se* unlawful and
    requires termination of the resulting contract. *Unified Architecture & Eng'g v. United States*, 46 Fed.
    Cl. 56, 64 (2000); *Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992).

1   identified in its proposal as key personnel to work on the Contract and that the Contract should thus

2   be terminated for misrepresentation.  To support this contention, Plaintiff first argues that AMSEA

3   failed, post-award, to offer jobs to two of its proposed port engineers.  Plaintiff argues that this

4   suggests that AMSEA never intended to hire them.  Second, Plaintiff contends that AMSEA

5   included in its bid proposal letters of commitment signed by the proposed port engineers warranting

6   that the signatories had reached mutual agreement with AMSEA with respect to salary, benefits, and

7   position, when, in actuality, AMSEA and the proposed employees had never discussed those issues.

8   In its recently-issued advisory opinion, the GAO agreed with Plaintiff on the latter issue, finding

9   sufficient evidence that AMSEA had misrepresented the commitments of its proposed port engineers

10  that it would sustain the bid protest.[13]  The Court agrees with the GAO that Plaintiff has raised

11  questions about AMSEA's conduct here.  However, for the following reasons, the Court finds that

12  the record is sufficiently ambiguous with regard to whether AMSEA actually engaged in fraud that

13  the Court cannot find that Plaintiff has met its burden in its request for injunctive relief.

14                          **i.       AMSEA's Failure To Hire Slaven or Erickson.**

15          Plaintiff argues that AMSEA's failure, once the Contract was awarded, to offer jobs to two of

16  its proposed port engineers supports Plaintiff's contention that AMSEA engaged in fraud.  Plaintiff

17  argues that Matthew Slaven, who was identified in AMSEA's bid proposal as someone who would

18  work as a port engineer on the Contract if awarded, was never offered a job by AMSEA.  AMSEA

19  explains that shortly after it was awarded the Contract, Slaven reported to someone at AMSEA that

20  he was not available due to the increasing demands of his own business.  Slaven confirmed, under

21  oath, that although he did not specifically recall having a conversation with anyone at AMSEA, his

22  business was, indeed, very busy during that period of time.  Plaintiff also makes much of the fact

23  that Rick Erickson was not hired by AMSEA post-award.  AMSEA explains, however, that in the

24  interim period between AMSEA's submission of its proposal and the award of the Contract, two

25  things occurred.  First, Erickson had decided to retire and would only work on an LMSR vessel if it

26  were located near the Norfolk, Virginia area where he lived.  No vessel was located near Norfolk.

27

28          _____

            [13] The Court notes that the standard employed by the GAO in determining whether a bid protest
        is meritorious is different from the standard employed in the context of a motion for injunctive relief.

United States District Court

For the Northern District of California

1    Second, based on work experiences with Erickson after the proposal was submitted, AMSEA

2    decided that it would not hire him as an LMSR port engineer.  Plaintiff's evidence, when viewed in

3    light of the testimony of Mr. Slaven and the explanations provided by AMSEA, fails to establish a

4    strong likelihood that AMSEA engaged in fraudulent misrepresentation when it included Slaven and

5    Erickson in its bid proposal.[14]

6                          **ii.      Agreement Regarding Position, Salary, and Benefits**

7         Plaintiff also contends that AMSEA submitted false commitment letters for its proposed port

8    engineers and that this amounted to fraud.  The Solicitation expressly required that offerors submit

9    letters of commitment from each proposed key employee reflecting that a mutual agreement had

10   been reached with respect to "position, salary, and benefits."[15]  (Gardner Decl., Ex. H, Tab 3 at 129.)

11   AMSEA submitted a bid that included letters of commitment from six proposed port engineers that

12   expressly warranted that the proposed employees were "in agreement with [AMSEA] with respect to

13   salary, benefits, and position."  Robin Booth, who was responsible for preparing AMSEA's proposal

14   in response to the Solicitation, testified during a recent GAO hearing that he spoke with AMSEA's

15   proposed port engineers, drafted the letters of commitment, obtained signatures, and submitted them

16   to MSC.  He admitted that he never discussed with the proposed port engineers the salary, benefits,

17   or location where the proposed port engineers would be assigned.  This establishes, according to

18   Plaintiff, that the letters of commitment submitted by AMSEA were false and that the Contract

19   should be terminated for misrepresentation.

20        AMSEA contends that its failure to discuss salary and benefits with the proposed port

21   engineers does not reflect a lack of mutual agreement because the basic, market-based range of

22   salaries was well-known to both AMSEA and the proposed port engineers, and the port engineers

23   were already employed by AMSEA and were well aware of the benefits to which they were entitled.

24

25        [14] Having determined that Plaintiff has not sufficiently demonstrated that AMSEA's inclusion

26   of Slaven and Erickson in its bid proposal was a misstatement, the Court need not reach the question
     of whether the alleged misstatement was material to MSC's award decision.

27        [15] Plaintiff contends that "position," here, means the location where the ships were layberthed

28   and where the employee would be required to live and work.  While the Court has found nothing in the
     Solicitation itself assigning such a definition to the term, the Government appears to agree that
     Plaintiff's understanding is the correct one.

                                                    15

AMSEA's position is corroborated by the fact that each of the port engineers signed letters of commitment which expressly stated that a mutual agreement had been reached regarding salary, benefits, and position.  The fact that these same port engineers have now testified before the GAO that they did not have specific discussions or specific agreements with AMSEA regarding the salary and position associated with the LMSR contract raises questions regarding the accuracy of the warrantee in the letters of commitment that a mutual agreement on those key matters had been reached.[16]  However, while Plaintiff alleges facts relevant to whether agreement had been reached on salary and position prior to the submission of the letters of commitment, the Court does not find that there is sufficient evidence, to warrant injunctive relief, that AMSEA engaged in fraud by submitting those letters in connection with its bid proposal.[17]  Accordingly, upon review of the voluminous evidentiary record before the Court, and the recently-issued GAO advisory opinion, the Court finds that Patriot has failed to establish, as it must, a strong likelihood of success on the merits of its fraudulent misrepresentation claim.

### b.    Bait and Switch

A bait and switch damages the integrity of the procurement system and violates federal procurement laws.  *See, e.g.,* 10 U.S.C. § 2304(a)(1)(A) (requiring "full and open competition" in procurement).  To demonstrate a bait and switch, a bid protestor must show that (1) the awardee represented in its proposal that it would rely on certain specified personnel in performing the services; (2) the agency relied on this representation in evaluating the proposal; (3) it was foreseeable that the individuals named in the proposal would not be available to perform the contract work; and (4) personnel other than those proposed are performing the services.  *Unified Architecture*, 46 Fed. Cl. at 65 (denying a preliminary injunction, reasoning that the awardee's post-award advertisement for a program manager was not evidence of intent by the awardee to engage in

---

[16] In its motion for injunctive relief pending appeal, filed subsequent to the issuance of the Court's May 16, 2005 Order, Plaintiff Patriot suggested that the Court misread the proposed port engineers' GAO hearing testimony.  The Court has reviewed the testimony, but does not find that the testimony mandates a different result here.

[17] Again, having determined that Plaintiff has not sufficiently demonstrated that AMSEA's letters of commitment contained misstatements, the Court need not reach the question of whether those alleged misstatements were material to MSC's award decision.

United States District Court
For the Northern District of California

a bait and switch.)  "Termination of a contract award based on the proposal is appropriate where such a misrepresentation materially influences an agency's evaluation of an offeror's proposal."  *Id.* at 64.  Here, according to Plaintiff, AMSEA engaged in a personnel bait and switch, MSC relied on AMSEA's misrepresentations when it credited AMSEA for the identified personnel, and AMSEA's Contract should thus be terminated.[18]

The Court finds that Plaintiff has not demonstrated that it was foreseeable to AMSEA when it submitted its bid proposal that the proposed port engineers would not be available to work on the LMSR Contract.  *Unified Architecture*, 46 Fed. Cl. at 65.  Although several of the port engineers identified by AMSEA in its proposal became unavailable to work on the Contract, it is not clear that AMSEA knew or should have known that this would occur.  This is particularly true in light of the amount of time that had elapsed – nearly one year – between AMSEA's submission of its initial bid on February 18, 2003, and the date on which it began substituting personnel (January 10, 2004). *Consol. Eng'g Servs. v. United States*, 2005 U.S. Claims LEXIS 100, *57 (Fed. Cl. Feb 14, 2005). Moreover, the Solicitation expressly recognizes that identified key personnel may, subsequent to submission of the proposal, become unavailable, and allows the awardee to substitute identified personnel with equally-qualified or better-qualified personnel, which AMSEA has done here.  (*See* Gardner Decl, Ex. H, Tab 3 at 77–78.)  Accordingly, the Court finds that Plaintiff has not demonstrated that the third requirement of a bait and switch has been met here.

—

Government agencies are entitled to substantial deference in their contract award decisions. Unless the agency is shown to have made its decision unreasonably, courts will not intervene.  Here, in light of that deferent standard, the Court finds that Plaintiff has failed to demonstrate a likelihood of success on the merits of its claim that the procurement process was flawed and that MSC awarded the Contract to AMSEA in error.

With respect to Plaintiff's claims regarding AMSEA's misconduct in the procurement process, no deference is due.  However, the end result is the same on those claims.  Regarding the

---

[18] Citing *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 855 (1999), the Government suggests that a finding of agency bad faith is required to find that a bait and switch occurred here.  The Court disagrees.

1   bait and switch argument, the Court finds that Plaintiff has not demonstrated a likelihood of success

2   on the merits.  Regarding Plaintiff's contention that AMSEA engaged in fraud by proposing key

3   personnel it did not intend to hire, the Court finds that Plaintiff has raised serious questions about

4   AMSEA's conduct but has not shown a sufficiently strong likelihood of success on the merits.

5       **B.    Irreparable Harm**

6           Plaintiff correctly states that it will suffer irreparable harm if a preliminary injunction does

7   not issue because a disappointed bidder cannot recover anticipated profits.  *See Hawaiian Dredging*

8   *Constr. Co. v. United States*, 59 Fed. Cl. 305 (2004) (finding irreparable harm because protesting

9   bidder is entitled only to bid preparation costs; the only way to recover lost profits is by equitable

10  relief).  Defendant and Intervenor-Defendant AMSEA contend that because Plaintiff will suffer only

11  economic injuries if the Government is not enjoined, Plaintiff has failed to establish irreparable

12  harm.  The Court disagrees.

13          "The usual rule is that mere loss of money does not qualify as irreparable harm if the party

14  can be made whole through money damages when the claim is resolved on the merits."  *Id*. at 317.

15  But "[i]f lost profits do not constitute irreparable harm, then a protester that seeks to displace a

16  putative awardee automatically fails to meet one of the requirements for injunctive relief."  *Id*.  Such

17  a result would be unjust and has been rejected.  "Loss of anticipated profits . . . can be remedied

18  solely by injunctive relief."  *Id*.  Thus, the Court finds that Plaintiff has established that it will suffer

19  irreparable harm if the Government transitions the operation and management of the LMSRs to

20  AMSEA before the claims raised in its complaint are adjudicated.

21      **C.    Balance of Hardships**

22          Defendant argues that even if Plaintiff has established irreparable harm, a balancing of

23  hardships weighs in the Government's favor.  According to Defendant, the Government and

24  AMSEA would suffer serious harm if the Government were enjoined from completing the turnover

25  of the LMSRs to AMSEA.  First, the Government claims that it will incur substantial expense if the

26  transition is further delayed because it will be forced to wait another year to complete the scheduled

27  turnover and AMSEA may seek to recover $130,000 in overhead expenses for every additional

28  month of delay.  Second, if the injunction were to issue, AMSEA would suffer a substantial

United States District Court
For the Northern District of California

18

1   monetary loss – in part due to lost profits on the Contract, but also because it has already begun to

2   mobilize to perform on the Contract.  *The Cube Corp. v. United States*, 46 Fed. Cl. 368, 388 (2000)

3   (noting that economic harm to awardee should be considered).  With respect to the Government's

4   and AMSEA's injuries, Plaintiff contends that the balance still tips in favor of granting injunctive

5   relief.  The Court finds both sides have demonstrated the potential for substantial harm.  In any

6   event, even assuming that Patriot has raised serious questions regarding the likelihood of success on

7   its misrepresentation claim, the balance of hardships does not tip sharply in Patriot's favor.

8                           **D.      Public Interest**

9            Plaintiff contends that the public interest is served by ensuring that a procurement process

10  "conforms to applicable procurement regulations."  *Hawaiian Dredging*, 59 Fed. Cl. at 318

11  (citations omitted).  Additionally, Plaintiff argues that the public would actually be benefitted by the

12  delay because with Patriot continuing to operate and maintain the LMSRs at its previously

13  contracted-for price (lower than AMSEA's proposed price), the Government and the taxpayers

14  would pay less for exceptional services.  Plaintiff is right that "savings to the Government . . . also

15  should be taken into account."  *Hawaiian Dredging*, 59 Fed. Cl. at 318.  However, its argument, in

16  this particular case, is undercut somewhat by the Government's representation that AMSEA would

17  bill the Government (and thus, the taxpaying public) $130,000 per month if there is further delay.

18           The Intervenor unions also contend that they will suffer irreparable harm if the transfer of the

19  LMSRs is not enjoined because those employed on the LMSRs will be out of work if Patriot loses

20  this contract.  The unions contend that their members are unwilling to work for AMSEA because

21  they would lose hard-earned seniority and pension status.  While the turnover of the LMSRs is

22  clearly a hardship for the unions and their members, the Court notes that the honorable sailors and

23  merchant marines and other essential personnel operating and maintaining these particular ships

24  were never guaranteed that Patriot would always have the LMSR contract with the Government.

25           The Government argues that denying Plaintiff's motion would serve the public's "strong . . .

26  interest in avoiding disruptions in procurement" and in "minimizing the costs of federal

27  procurements."  *Shoals*, 877 F.2d at 888; *Vanguard Sec., Inc. v. United States*, 20 Cl. Ct. 90, 113

28  (1990).  Even more significantly, at issue here is the operation and maintenance of vessels that are

**United States District Court**
For the Northern District of California

19

1   vital to the nation's military capability.  The public most certainly has a strong interest in avoiding a

2   substantial disruption in the operation of such ships, particularly when they may need to be deployed

3   at a moment's notice.

4       The Court finds that while Plaintiff and the Intervenor unions have shown that the public will

5   be harmed if the injunction does not issue, those concerns are, at least slightly outweighed by the

6   public's interest in ensuring that essential military vessels operate as smoothly as possible.

7   Accordingly, this factor tips in favor of denying the relief sought.

8       **E.       Application of Preliminary Injunction Standard**

9       The Court finds that both parties have demonstrated the potential for serious harm here.  In

10   such a situation, the plaintiff must show a strong likelihood of success on the merits.  This is

11   particularly true in the context of a motion for injunctive relief against the Government and where

12   the relief sought is, in large part, mandatory.  Plaintiff has not met its high burden.  The

13   Government's decision to award the ship operation contract to AMSEA was reasonable and is

14   entitled to substantial deference.  With respect to Plaintiff's contention that AMSEA engaged in

15   fraud warranting termination of the Contract, the Court finds that Plaintiff has raised serious

16   questions about the integrity of the procurement process.  However, this is not enough to

17   demonstrate a strong likelihood of success on the claim's merits.  Plaintiff has also failed to

18   demonstrate that the balance of harms tips sharply in its favor.  Accordingly, Plaintiff's motion for

19   injunctive relief must fail.

20                                    **CONCLUSION**

21       For the foregoing reasons, the Court **DENIES** Plaintiff's motion for preliminary injunction.

22

23       **IT IS SO ORDERED**

24    Dated: May_23__, 2005



25                                    _/s/_ _____
                                     MARTIN J. JENKINS

26                                   UNITED STATES DISTRICT JUDGE

27

28

**United States District Court**
For the Northern District of California